WENDELL W. WOOD, ET AL.

V.

STUART F. CARWILE, ET AL.

Record No. 822105

April 25, 1986

Present: All the Justices

*James R. Sheeran* for appellants.
*Edward B. Lowry (Gary W. Kendall; Michie, Hamlett, Donato & Lowry*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal arises out of a quantum meruit suit for the recovery of legal fees. Stuart F. Carwile, David W. Kudravetz, and Ross W. Krumm, former law partners in the firm of Carwile, Kudravetz & Krumm* (hereinafter collectively referred to as "Carwile"), sued Wendell W. Wood and Marlene C. Wood, hus-

---

* From January 1975 through February 1976, the partnership consisted of Carwile and Kudravetz. Krumm became a partner in 1976.

band and wife, for the value of legal services rendered to the Woods from January 1975 through September 1978. Suit was filed on February 13, 1981. Carwile asserted that the Woods owed $170,487.66 with interest thereon from October 1, 1980. The trial court ruled that $47,284.26 of the total claim was barred by the statute of limitations. In a jury trial, Carwile secured a joint and several judgment against both the Woods in the amount of $67,750.00 with interest thereon. Further, Carwile secured judgment against Wendell Wood alone in the amount of $44,828.00 with interest thereon.

On appeal, the Woods contend the trial court erred in admitting into evidence their financial statements for the years 1975, 1976, 1977, and 1978. The Woods argue that this evidence was irrelevant in a quantum meruit suit and that its introduction prejudiced them by causing the jury to focus upon their wealth instead of upon the value of the services rendered by Carwile. In our opinion, the trial court did not err in admitting the financial statements; therefore, we will affirm the evidentiary ruling.

Carwile cross-appeals. He contends the trial court erred in limiting his claim to services rendered within three years of the date suit was filed. According to Carwile, the statute of limitations on his entire claim did not begin to run until the termination of his representation of the Woods. We agree. Therefore, we will reverse the trial court's ruling on the statute of limitations issue.

The pertinent facts are as follows: The Woods were real estate developers. They were engaged in numerous complex real estate transactions and related efforts to secure financing for their projects. More specifically, the Woods were involved in the purchase and sale of large tracts of land, the negotiation for and securing of loans from several banks, litigation arising out of various transactions, efforts to resist foreclosure on properties on which payments were in default, searches for additional financing, and the preparation and filing of appropriate tax returns.

Significantly, either both the Woods were or Wendell alone was personally liable on virtually all their transactions, most of which were interrelated. With regard to personal liability, Wendell Wood testified as follows: "[I]n the twenty-one (21) years I have been borrowing money I have always personally endorsed any loans whether it has been through corporations or what, I have always personally endorsed them." Carwile testified that though Mrs. Wood was not personally liable on all the transactions, she

was personally liable on certain loans from First and Merchants National Bank, one in the amount of $900,000 and the other in the amount of $2,450,000.

With regard to the relationship among the transactions, Carwile testified at a hearing on the statute of limitations issue that the Woods' transactions were interrelated because they had six or seven major properties and four or five major lending institutions. As a result, according to Carwile,

> there was pretty much a continual shifting of collateral from — and of refinancing and by individual banks or collateralization of loans and going from one property to another, subordination collateral — we'd start at one institution, go to another and go to another and there was exchanges of collateral, exchanges of lien priorities in collateral.

Carwile said further that the Woods' transactions could not have been handled separately by attorneys who were not familiar with the other transactions.

In responses to requests for admissions that were read to the jury, Wendell Wood admitted that he requested Carwile to represent him on at least eleven matters including a $400,000 loan from United Virginia Bank in Charlottesville; a dispute with Rio Associates Limited Partnership concerning a $1,495,000 deed of trust; and loans from First and Merchants National Bank in the amounts of $900,000 and $2,450,000. Wood further admitted that "for the period of time covered by the bill for services . . . Carwile . . . acted as primary counsel for legal work performed on behalf of Wendell Wood . . . on matters involving bank financing, transactions, tax planning, tax preparation for all commercial real estate transactions." Further, Wood admitted that he relied upon Carwile "to keep and maintain the records of Wendell Wood's various legal matters which Carwile . . . undertook on his behalf." Wood also admitted that on several occasions Carwile's efforts prevented foreclosure on certain properties. Additionally, Wood admitted that he paid fees without designating that they be applied to any specific transaction.

To resolve the question of the relevance of the Woods' financial statements, we must consider two things: (1) what can properly be proved in a quantum meruit claim for legal fees, and (2) the general rules of relevance. We set forth in *Co. of Camp-*

*bell* v. *Howard*, 133 Va. 19, 51, 112 S.E. 876, 885 (1922), the factors that may be taken into account in a suit to recover legal fees based on quantum meruit:

> [T]he measure of compensation which attorneys at law are entitled to recover for services rendered under an employment which contains no provision fixing a definite compensation, is the reasonable value of the services rendered, not in benefit to the client, but, in themselves, on a *quantum meruit*; and . . . the circumstances to be considered in determining the compensation to be recovered are — the amount and character of the services rendered; the responsibility imposed; the labor, time and trouble involved; *the character and importance of the matter in which the services are rendered; the amount of the money or the value of the property to be affected*; the professional skill and experience called for; the character and standing in their profession of the attorneys; and whether or not the fee is absolute or contingent, it being a recognized rule that an attorney may properly charge a much larger fee where it is to be contingent than where it is not so. The result secured by the services of the attorney may likewise be considered; but merely as bearing upon the consideration of the efficiency with which they were rendered, and, in that way, upon their value on a *quantum meruit*, not from the standpoint of their value to the client.

(Emphasis added) (citations omitted). *See also Heinzman* v. *Fine, Fine, Legum & Fine*, 217 Va. 958, 234 S.E.2d 282 (1977). In *McNeir* v. *Greer-Hale Chinchilla Ranch*, 194 Va. 623, 629, 74 S.E.2d 165, 169 (1953), we pointed out that

> "all facts having rational probative value are admissible unless some specific rule forbids. However, the weight or probative value is not the criterion or test. If it tends even slightly to prove a fact relevant to any issue in the case and material or forceful in the determination thereof, it is admissible. The criterion of relevancy is whether or not the evidence tends to cast any light upon the subject of the inquiry."

(Quoting 7 M.J., Evidence § 38 at 374-75.) *See, e.g., Horne* v. *Milgrim*, 226 Va. 133, 306 S.E.2d 893 (1983); *Peacock Buick* v. *Durkin*, 221 Va. 1133, 277 S.E.2d 225 (1981).

■ Carwile contends that because the Woods were personally liable in most of their transactions, all of their assets were at risk. Thus, argues Carwile, the financial statements covering the period of representation are relevant to at least two of the factors set forth in *Co. of Campbell*. We agree. Given the interrelated nature of the bulk of the Woods' transactions, the jury was entitled to consider the character and importance of the representation from the standpoint that a misstep with regard to any one of the interrelated matters could have had a "domino effect," jeopardizing a substantial portion of the Woods' assets. The financial statements helped prove that the work done by Carwile was not trivial but instead was of great importance to the Woods.

■ Closely related to the foregoing is the point that the financial statements were pertinent to the value of the property at risk. Because the Woods were personally liable on many, if not all, of their dealings, their potential exposure extended to all of their assets. The Woods argue that the property-at-risk factor should be narrowly applied so that only the specific property on which the attorney is working at the time can be said to be at risk. This interpretation is at odds with the evidence in this case. Here, in essence, everything was tied together. The separation of transactions urged by the Woods is artificial and far removed from the way they actually transacted their business.

■ We note further that here the trial court was careful to give a limiting instruction which made clear to the jury that it was not to use the financial statements to award damages against the Woods simply because they were people of wealth. The trial court, referring to the financial statements, said, among other things:

> Those statements purport to show the net worth of the Woods and *you are not to take those as having been received for anyway indicating they are liable for these attorney fees.* They are received solely for the purpose of your consideration and as you go through the criteria listed in this instruction as to a [quantum] meruit recovery. . . . *Just because the Woods may have substantial wealth doesn't mean a verdict should be awarded against them.*

(Emphasis added.)

It is also true, as Carwile argues, that the fact of the Woods' wealth was apparent throughout the trial without regard to the

introduction of the financial statements. There was repeated testimony concerning multimillion-dollar transactions, the ownership of a helicopter, the ownership of bank stock, and other such evidence so that the jury was already aware that the Woods were people of means.

Further, the verdicts were in line with the claims and the proof. Nothing in the record suggests that the jury's verdicts were influenced by the Woods' financial status.

■ We hold, therefore, that under the facts and circumstances of this case, the trial court did not err in admitting into evidence the defendants' financial statements.

■ The statute of limitations question was discussed in a related context in *McCormick v. Romans and Gunn*, 214 Va. 144, 198 S.E.2d 651 (1973). That case involved a suit by a client against her attorneys for certain deficiencies on the sale of real property that was handled by the attorneys. The attorneys claimed that the statute of limitations had run on their former client's claims. We disagreed. In rejecting their contention, we wrote as follows:

> As a general rule, the statute of limitations begins to run against a cause of action at the time of its accrual. *But where there is an undertaking which requires a continuation of services, the statute of limitations does not begin to run until the termination of the undertaking. Wilson* v. *Miller,* 104 Va. 446, 448, 51 S.E. 837, 838 (1905). This special rule is applicable to a continuing agreement between attorney and client. *Beale* v. *Moore,* 183 Va. 519, 525-26, 32 S.E.2d 696, 698-99 (1945). Indeed, *it is particularly appropriate to an attorney-client agreement in view of the confidence and trust inherent in that relationship. Keaton Co.* v. Kolby, 27 Ohio St.2d 234, 237, 271 N.E.2d 772, 774 (1971).

214 Va. at 148-49, 198 S.E.2d at 654-55 (emphasis added). What we said in *McCormick* guides our disposition of this appeal.

■ Here, the trial court found as a fact that there existed a continuation of services in the relationship between Carwile and the Woods. In a letter opinion, the trial court wrote as follows:

> *it is clear plaintiffs' representation of the defendants was one requiring a continuation of services.* While the parties disagree as to when that representation began, they agree it

existed throughout much of the 1970's and involved most of defendants' legal business. That business included numerous related and unrelated acts and transactions.

Despite finding a continuation of services, the trial court concluded that because Carwile had a "right to require payment for their services prior to the termination of their relationship," the statute began to run "from the time plaintiffs had the right to demand payment." This was error.

█ The trial court based its opinion on *Riverview Land Co.* v. *Dance*, 98 Va. 239, 35 S.E. 720 (1900), where we said that "although the employment or agency is a continuing one, yet if the agent had the right to require payment for advances or compensation for services prior to the termination of the agency . . . the statute begins to run from the time the agent had the right to demand payment for his services or for advances." *Id.* at 244, 35 S.E. at 722. However, we distinguished *Riverview Land Co.* in *Beale* v. *Moore*, 183 Va. 519, 32 S.E.2d 696 (1945), which, like the instant appeal, concerned a suit for legal fees and, in effect, limited *Riverview Land Co.* to its facts.

Significantly, *McCormick*, which sets forth this Court's most recent statement of the application of the statute of limitations in a suit between an attorney and client, relies on *Beale* while making no mention of *Riverview Land Co.* We conclude then that the reasoning of *Beale* and *McCormick* is applicable to this appeal and that the trial court should not have applied *Riverview Land Co.*

█ On the statute of limitations issue, we hold that the trial court erred in ruling that a portion of Carwile's claim was time barred. Carwile should have been permitted to adduce evidence on that portion of his claim which the trial court held to be time barred. We will remand this case to the trial court for that purpose.

*Affirmed in part,*
*reversed in part,*
*and remanded.*