## CIRCUIT COURT OF ROCKBRIDGE COUNTY

Candace Wilkerson McDaniel

v.

Robert E. St. Clair
and John McClung

February 16, 1990

By JUDGE GEORGE E. HONTS, III

This action came upon January 20, 1990, on a plea of the statute of limitations by the defendant St. Clair and by the defendant McClung. The parties have briefed their positions.

A brief recitation of the chronology of events will be helpful. Candace W. McDaniel (Candace) was given a prescription for Vitamin A in 1962 by a dermatologist. The dosage prescribed was 50,000 units twice a day. Candace's complaint was teenage acne. Counsel advises the largest non-prescription dose available is 10,000 units. Candace continued to take the prescribed dosage until April, 1987, with, as we shall see, dramatic and traumatic consequences.

At some time in the 1970s, Candace came under the care of John McClung, M.D. Their last patient-to-doctor contact was in 1979. Apparently, Dr. McClung continued the original Vitamin A prescription.

At some time in the early 1980s, Candace became a patient of Dr. Weddle, a board-certified family practice doctor in Buena Vista. In February, 1985, Candace complained to him of severe abdominal pain. Tests and x-rays showed Candace had an enlarged spleen and suffered anemia. Tests

also showed a liver GOT count of 33, which Dr. Weddle described as "high but not alarming." The enlarged spleen masked the liver on the x-ray. Dr. Weddle focused on the spleen and Candace's bone marrow. Dr. Weddle suspected leukemia, based on the symptoms Candace displayed.

In May, 1985, Dr. Weddle communicated his suspicions to Candace and referred her to Dr. Rosenoff, a specialist in Roanoke, Virginia. Despite Dr. Weddle's frankness and urgings, Candace refused to see Dr. Rosenoff.

In February, 1987, Dr. Weddle describes Candace as suffering a "panic attack." Again, in the presence of her husband, Dr. Weddle urged Candace to seek specialized diagnosis. She refused to do so.

In April, 1987, Candace had a very low blood count. Dr. Weddle by now was reasonably certain Candace suffered from leukemia. At this time, Candace came under the care of Dr. Whelby, a hematologist at UVA Medical School.

Dr. Weddle was never told and did not learn of the massive doses of Vitamin A until after April, 1987.

Apparently, Dr. Whelby, after a series of tests, had narrowed Candace's ailments to either a cancer or a liver disease. He, too, was focusing on a diagnosis of leukemia when, fortuitously, an intern happened to notice a bottle of Vitamin A pills on Candace's night stand. Upon inquiry, Dr. Whelby found Candace had been taking Vitamin A for twenty-five years.

Dr. Whelby's evidence is that liver damage had occurred prior to 1981. By 1987 her cirrhosis of the liver had become so acute as to be life-threatening. The evidence indicates she very nearly bled to death on two occasions.

Whether Vitamin A is the actual cause of Candace's condition is a question deferred to another day. For our purposes here, suffice it to say Dr. Weddle's testimony is that any medication taken in sufficient quantity for sufficient time is potentially toxic to the liver. For example, Tylenol, he testified, is potentially a liver problem drug.

Candace became a customer of Rockbridge Pharmacy in Glasgow, Virginia, in 1972. That pharmacy was owned and operated by Robert St. Clair (St. Clair), a defendant here. St. Clair is now retired.

He testified that on November 17, 1984, prescription

no. 114491 was authorized by Dr. McClung. No. 114491 was an update of an old prescription for Vitamin A for Candace.

St. Clair operated the pharmacy with only occasional relief from 1972 to 1983. In 1983 he cut his work week back to three days and retired in 1985. A subsequent sale of the pharmacy soured, and in early 1987, St. Clair returned to operate the pharmacy for a short while, finally closing the business in the fall of 1987.

St. Clair testified that the authorization for prescription no. 114491 was obtained by pharmacist Rorer, who was a relief pharmacist for St. Clair, from Dr. McClung. The authorization was said to have been done by a telephone call from Rorer to Dr. McClung. Dr. McClung denies ever giving such an authorization.

Acting under prescription no. 114491, Candace's Vitamin A supply was replenished twice in 1984, seven times in 1985, six times in 1986, early 1987, and on March 21, 1987. Candace testified St. Clair filled the last prescribed dose. St. Clair testified Rorer filled the last dosage, and all refills were per Dr. McClung's prescription.

Candace gave notice to St. Clair of this action on September 9, 1988, and filed the action on December 13, 1988. Neither party requested a medical malpractice review board.

Candace gave notice to Dr. McClung of this action on March 29, 1989, and filed this action July 10, 1989.

1. *Is the action against St. Clair, the pharmacist, time-barred?*

Candace maintains that the continuing course of treatments rule should be extended to pharmacists and, by doing so, the time of commencement of the running of the statute of limitations would be fixed as of March 21, 1987, the date of the last prescription refill.

The rule of a continuing duty between a professional person and a lay client-customer has been established in Virginia for fiduciaries, *McCormick v. Romans*, 214 Va. 144 (1973); dentist-patients, *Farley v. Goode*, 219 Va. 904 (1979); architects, *V.M.I. v. King*, 217 Va. 751 (1977); attorneys, *Wood v. Carwile*, 231 Va. 320 (1986); accountants, *Boone v. C. Arthur Weaver Co.*, 235 Va. 157

(1988); and, of course, medical doctors, *Fenton v. Danaceau*, 220 Va. 1 (1979), and has acted to delay the running of the statute of limitations until such time as the care, services, or supervision of the professional has been terminated.

The Supreme Court of Virginia has stated, "Since the beginning of this century, our cases have adhered to the general proposition that where there is a continuation of services, the Statute of Limitations does not begin to run . . . until the termination of the undertaking. . . ." *Keller v. Denny*, 232 Va. 512, 516 (1987).

Additionally, pharmacists are licensed and regulated by a board established under the Department of Health Professions by virtue of Chapter 25, Subtitle III of Title 54.1 of the 1950 Code of Virginia. Among the professions regulated by the Department of Health Professions are dentistry, medicine, nursing, and pharmacy. As noted above, dentistry and medicine are two professions to which the continuing treatment-duty rule has been applied.

Precisely what a pharmacist's duty to his customer is is not clear. That precise question is not currently before this court in this motion. It is sufficient to note that Section 54.1-3300 of the Code of Virginia defines " 'Practice of Pharmacy' means the *personal health service* . . . concerned *with* . . . *selecting*, procuring, *recommending*, administering, preparing, compounding, packaging, and dispensing drugs, medicines, and devices used in the diagnosis, treatment, or prevention of disease . . . ." (Emphasis added.)

By this definition, the General Assembly seems to have recognized that the art of pharmacy is not mechanical. "Selecting" and "recommending" are words connoting the exercise of judgment and discretion. The duty of a pharmacist, I conclude, consists of more than merely counting the pills, putting them in a bottle, typing a label, and handing the bottle to the customer. Having reached that conclusion, then it becomes unnecessary to attempt to further define a pharmacist's duty to his customer. The duty of the pharmacist is that of a health care professional and as such is a continuing duty, and the rule of continuing duty should be applied to pharmacists as it has been applied to other professions noted above.

Accordingly, I find that the statute of limitations on Candace's claim against St. Clair did not start to run until March 21, 1987, and accordingly, her action is not time-barred.

This ruling rests, of course, upon the rather meager evidence now before me. Should the fact St. Clair did not fill the prescription of March 21, 1987, or that he was not responsible for that refill of the prescription be established, then leave is granted the defendant to renew his plea.

Counsel for plaintiff is directed to prepare and present a properly endorsed order in conformity herewith.

*2. Should summary judgment be granted Dr. John McClung?*

The facts recited at the beginning of this opinion are sufficient and need not be recited in their entirety here.

For the purposes of this decision, we shall assume without deciding that Dr. McClung authorized prescription no. 114491 on November 17, 1984.

By virtue of § 54.1-3455 of the Code of Virginia, Vitamin A dispensed in 50,000 unit lots is a Schedule VI controlled substance: "3. Any drug, not included in Schedules I, II, III, IV, or V . . . required by federal law to bear on its label the legend: 'Caution: Federal Law Prohibits Dispensing without prescription'. . . ."

Section 54.1-3411 of the Code provides:

3. A prescription in Schedule VI may not be refilled, unless authorized by the practitioner or orally by the practitioner . . . . Oral instructions shall be reduced promptly to writing by the pharmacist and filed on or with the original prescription.

4. A prescription for a drug controlled by Schedule VI may be refilled without authorization from the prescriber if: reasonable effort has been made to communicate with the prescriber and the pharmacist has determined that he is not available and the patient's health would be in imminent danger without the benefit of

the drug. The pharmacist shall inform the patient of the prescriber's unavailability and that the refill is being made without his authorization. The pharmacist shall promptly inform the prescriber of such refill . . . .

A telephonic authorization to refill the prescription as alleged to have occurred on November 17, 1984, would meet the statutory requirements for a Schedule VI drug.

I further assume that the 1984 authorization was for refill as needed.

Remember, now, Dr. McClung had not seen Candace in person since 1979; that there is no evidence before the court of any communication directly between Dr. McClung and Candace since 1979; that there is no evidence of any communication or attempted communication between Dr. McClung and St. Clair or anyone else at the pharmacy regarding Candace after November 17, 1984.

Your attention then is directed to the *Commonwealth of Virginia: Regulations of the Board of Pharmacy*, issued February 1, 1988, as "Virginia Board of Pharmacy Regulations VR530-01-1."

Your attention is specifically directed to Regulation VR530-01-1, Part VI, Section 6.5, chapter 2, which reads: "A prescription for a Schedule VI drug . . . shall not be refilled if the prescription is more than two years old. In instances where the drug . . . is to be continued, authorization shall be obtained from the prescriber and a new prescription shall be filled."

There is nothing to indicate that this regulation was not in effect in 1984. If counsel can show me otherwise, I shall, of course, withdraw this opinion and reconsider what I am now deciding.

Dr. McClung's alleged authorization issued November 17, 1984, was valid, then, for all refills through the refill of October 23, 1986. The three subsequent refills of December 13, 1986, January 31, 1987, and March 21, 1987, could not lawfully have been authorized by the November 17, 1984, telephonic message.

Candace testified she relies upon St. Clair's representations that Dr. McClung prescribed and then authorized prescription no. 114491. St. Clair testified he relied upon Dr. McClung's 1984 authorization exclusively. St. Clair

476

is charged with notice of and knowledge of the regulations of the board created to regulate his practice. His reliance then as to the last three actual refills is totally unfounded.

Dr. McClung's duty to Candace ceased, probably on October 23, 1986; most likely on November 17, 1986; and more certainly on December 23, 1986, when the prescription was again refilled without a renewed authorization from him. At the latest, then, the Statute of Limitations began to run December 13, 1986, and had run by December 13, 1988. Since the notice of action was sent him on March 29, 1989, and the action was filed July 10, 1989, more than two years after his alleged duty ended, the action is time barred.

St. Clair and Candace cannot rely upon § 54.1-3411(4) of the Code absent evidence that (1) St. Clair or someone at the pharmacy attempted to communicate with Dr. McClung and found him to be unavailable; *and*, (2) that Candace's health would be in imminent danger without the benefit of the drug (The evidence is clearly to the converse; in fact, no evidence is found that her health was ever in imminent danger without Vitamin A.); *and*, (3) that St. Clair subsequently informed Dr. McClung he had refilled the prescription on an emergency basis and the reasons why he did so.

I feel compelled to note further that the cause of action against Dr. McClung, again assuming without deciding, that he first prescribed Vitamin A and then authorized renewal in 1984 does not fit the usual "mold" of malpractice claims. Dr. Whelby's testimony was to the effect Candace experienced liver damage as early as 1981. Dr. Weddle noted complications well beyond what a family practitioner could adequately diagnose and, recognizing that fact, urged examination by a specialist in 1985, advice Candace chose to reject. In fact, as I understand the evidence, Dr. Whelby discovered the massive doses of Vitamin A by chance.

"All medical examinations start with a history taking," Curran and Shapiro, *Law, Medicine and Forensic Science*, 3d ed., Little, Brown and Company, Boston, 1982, p. 56.

After discussion of medical history, Curran and Shapiro conclude: "These considerations, then, point up the importance of an adequate history skillfully obtained. In the

view of most medical authorities, the art of taking good clinical histories is the key to successful diagnostic work. Most experienced lawyers will agree." Curran and Shapiro, p. 61.

I do not suggest that either Dr. Weddle or Dr. Whelby did not skillfully obtain a medical history from Candace. I can only assume she did not give her twenty-five year history of 100,000 units of Vitamin A per day to Dr. Whelby. Dr. Weddle learned about that history after Dr. Whelby did. Perhaps Candace attached no significance to the dosage; after all, it was merely a vitamin, substances touted daily and loudly in all sorts of media commercials. And, after 1979, she was not communicating at all with Dr. McClung, a most unusual circumstance for an alleged physician-patient relationship.

So, if Dr. Whelby is correct, then the cause of action arose early on, perhaps before 1981. And had Candace actually and physically been under Dr. McClung's care in 1985 or had she given Dr. Weddle a complete history *or* followed his referral to a specialist, a proper diagnosis might have been made and thereby created a right of action.

In short, I am disturbed vis-a-vis Candace and Dr. McClung that the right of action was delayed by inaction on Candace's part. But, finding no Virginia law on this issue relating to the rising of a right of action, I will not create any, nor is it necessary that I do so.

Finding the Statute of Limitations to have run on Candace's claim against Dr. McClung, I sustain the plea of that statute and grant the motion for summary judgment.